Mr. Zarian, did I pronounce your name correctly? Wonderful. Come on up, please. And you may begin whenever you are ready.  You're welcome. Michael Zarian on behalf of Dr. Hamso. I'd like to reserve five minutes for rebuttal. Qualified immunity is meant to give officials the necessary breathing room to carry out their duties on behalf of the state without fear of liability. That need for breathing room is particularly strong here, where the law and the facts and science regarding these treatments at issue have been rapidly evolving over the past few years. People understandably have strong feelings about this issue, but Section 1983 does not punish officials like Dr. Hamso who make reasonable decisions based on the law and fact available to them at the time. Mr. Zarian, if we hold that Dr. Hamso is entitled to qualified immunity, do the constitutional claims still proceed based on the injunctive relief requested? We've argued that the injunctive relief claims are also before this court based on ICBAL, and we've appealed both the injunctive relief claims and the qualified immunity denial below. So to the extent the court agrees with our jurisdictional argument based on ICBAL, which I think is pretty clear that both can be appealed, then the injunctive relief claims are also before this court. They can be appealed, but can they be appealed on an interlocutory appeal? That's the question. Yes, Your Honor, and that was the issue in ICBAL as well, and ICBAL went on to scrutinize the factual sufficiency and then dismissed the claims entirely and remanded for the Court of Appeals to decide whether to allow repleting or not. So, yes, both are before this court in our view. The district court did not seem, I guess, as a magistrate judge, with consent, correct?  Seemed to be amenable to the renewal of the motion based on the accumulation of additional evidence. Is that correct? That was the district court's position, but we don't believe there's any extra evidence that's necessary to decide these claims. Qualified immunity generally should be decided at the earliest possible stage, and here these are essentially legal questions that additional facts won't shed additional light on. Whether there's a protected property interest, for example, in any specific Medicaid treatment is purely decided by the governing laws and regulations governing Medicaid, and same with equal protection. This idea of facial discrimination and whether it's a facially neutral statute can be decided just, or a facially neutral policy can be decided just by looking at the policy, for example. And honestly, we believe that Dr. Homsa doesn't even need qualified immunity. We were asking for qualified immunity, but doesn't need qualified immunity because there is no violation of the Equal Protection Clause or Due Process Clause here. Could I just get one factual issue straight so that I think we're speaking on the same terms, and that is I understand that the surgery at issue here is provided to cisgender individuals, and it's done so under a certain code in the Medicaid regime, but that that surgery is not provided to transgender individuals. Is that correct? The treatments are equal across transgender and cisgender individuals. So, for example, a mastectomy, for example, to treat breast cancer would be available to both transgender and cisgender people. The only differentiation that the alleged policy makes is on the basis of diagnosis. So for transgender or cisgender people, for these surgeries to treat gender dysphoria are not available. Well, but the treatment for gender dysphoria is the same treatment that's given to cisgender individuals, is it not? I mean, the surgery? The surgery may be the same, but it's not the same treatment. Breast cancer and gender dysphoria, performing these surgeries to treat each condition are very different. Well, we're not talking about breast cancer here, are we? So why don't we really stick to what the key issue is here? We're not really talking about breast cancer. We're talking about genital surgery. Well, I guess, Your Honor, it's this. So it could be genital surgery, but genital surgery could also be for penile cancer then. We can talk about penile cancer if you'd like. But the point is that to the extent it is available to a cisgender person, it would have to be available for some other condition and not for gender dysphoria. So it's solely based on the condition, correct? Solely based on the condition. So when they started out, the doctor says, well, you can't have this surgery because under the WPATH guidelines, you don't meet the psychiatric length of time, etc. They come back and say, no, no, look at this. So, okay, that goes by the wayside. And then the doctor comes back and says, no, this is cosmetic, correct? Correct. And so is that the state's position then that this is cosmetic and therefore not available? Correct. Well, our position is that it's not medically necessary, and cosmetic is the flip side of medical necessity, correct? You know, I think you would agree and probably the plaintiffs would agree, it all depends on how you define the issue for purposes of applying the qualified immunity analysis. If you say that, if you recognize that under our established principles in the Ninth Circuit that transgender requires something more in terms of heightened scrutiny without specificity, then where is that in the record? And that's what makes me wonder whether that isn't, if not a factual issue, an issue where the record is not fulsome because the state didn't seem to really come back on this medical necessity and provide, you know, why there was a weighing here. Well, we have provided evidence of medical necessity, and we've cited it in this brief. This isn't an appeal from an administrative decision. So this isn't like an APA, Chenery Doctrine, we're limited to things that were said in the administrative record. This is a 1983 claim, and we're allowed to bring our justification now, and we have provided some evidence of medical necessity. Right, but I don't think you can really litigate that in the Court of Appeals. You're entitled to bring it now, you're saying. We have to look at the district court as looking at qualified immunity and determining whether on that record. So, you know, you're right. This isn't a Chenery type appeal. We're not arguing over the Medicaid regulations or anything like that. We're arguing over what was the district court faced with. And the district court said, well, no qualified immunity now on this record, but, in fact, that issue is still open. So why is that wrong? Well, if the issue is open, then qualified immunity is appropriate. And the district court, the only... The issue is open for further development on whether the state met its burden. So as far as facial classification, the statute does not classify on the basis of transgender status. So Your Honor referred to some of the past cases. I assume you're talking about Karnosky or Doe, which talk about a heightened scrutiny when there is discrimination on the basis of transgender status. Here, that's not what we're talking about. We're talking about differentiation on the basis of medical diagnosis. And Karnosky and Doe specifically reserved that question. Karnosky in footnote 18 talked about whether this is just so closely associated with transgender status that it constitutes discrimination on the basis of transgender status. We're not reaching that question. And Doe said, we're going to let that question develop in the district court. That was on a preliminary injunction posture. And so that question has never been addressed. And simply citing, which is what the district court did, simply citing Bostock as the proposition that there should not be discrimination is not the highest possible level of generality and not sufficiently concrete to be able to resolve the specific debate here about whether regulating a procedure would constitute improper discrimination. You're not here, as I understand it, and correct me if I'm wrong in this apprehension, to defend at this point the policy. You're here representing Dr. Hamsa, who's an employee of the state. That's correct, Your Honor. Whose position, as I understand it, is I don't make this policy. The policy is set. I simply implement the policy. I'm not trying to violate anybody's constitutional rights. Do I have that right? I don't know if Dr. Hamsa's personal position is in the record, but essentially, yes, Dr. Hamsa was the ‑‑ there's no evidence of Dr. Hamsa creating the policy, for example. That's right. But there's no allegations. But as I understand it, there's yet to be a determination of the, if you will, constitutional solidarity of the state's position on this issue. Could you describe solidarity? Yeah, well, is the state correct in taking the position that Dr. Hamsa provided to the plaintiffs in this case? I can't do this surgery because the policy of the state is X. Yes, that was what Dr. Hamsa said, and the state believes the policy is constitutional, absolutely, and Dr. Hamsa's role was limited to implementing the policy. That's my point, and I may not have zeroed right in. Okay, that's right. There has yet to be a determination in this litigation as to the constitutionality of the state's position vis‑a‑vis this surgery.  I believe that's what the district court's opinion was, though, was that it didn't have anything to do with Dr. Hamsa's role in particular but did scrutinize the policy on whether it was constitutional or not and then whether Dr. Hamsa would be entitled to qualified immunity. If it's later determined that the state's policy in this regard was entirely constitutional and defensible, that's the end of the game for Dr. Hamsa, isn't it? That would also be the end of the game, or qualified immunity either way is a way that Dr. Hamsa would no longer be subject to personal liability. Okay, thank you. Thank you, Your Honor, and returning quickly to Judge McEwen's point about the policy, and I think there's one thing to point out that's important, which is that the policy can be applied entirely without reference to sex, and that was something that district court seemed to be a little bit confused about, which was that it has some sort of reference to sex or it has something to do with sex generally, but the policy can be applied simply by knowing the diagnosis of the patient and if a claim came in or a preapproval request came in without knowing the sex at all, only knowing that it was to treat gender dysphoria, that is how the alleged policy would be applied. That seems to me, I totally understand your point, but that seems to be in a circle. So if the diagnosis is gender dysphoria, isn't that in and of itself a gender-based determination? Somebody upstream may have made the decision that there was some sort of, had to have assessed the person's gender, but the policy would not have assessed the person's gender, and that would be true for any treatment of gender dysphoria. For example, the 12-month waiting period to be able to have the surgery, taking hormones, the exact same thing, or a ban on conversion therapy. I know this court recently addressed that in Tingley. All of these things to the same extent take into account somebody's sex or even another treatment, for example, for Turner syndrome, something where a woman doesn't have another X chromosome, for example. All of these treatments have something to do with sex in the abstract. But this has only to do with sex and gender, doesn't it? Can you give me anything in the record to look to where I would be able to say, well, gender dysphoria as a diagnosis has something to do with something that isn't gender or sex-based? I don't think we would disagree that somebody diagnosing someone with gender dysphoria would take into account somebody's sex, but that is upstream of the policy that's being applied. And generally, equal protection, the relevant question is whether the policy at issue classifies on the basis of sex. Well, I guess, I mean, isn't that just a different way of saying the question I asked? And that is, it is, if you can't have this surgery, and the only, I mean, people who legitimately qualify, whether under WPATH or some other criteria, would need to be transgender. Isn't that a gender-based classification? No, Your Honor, and I think that sounds a lot like the reasoning that was rejected in Guduldig, right? Well, and you're going to say the pregnancy case? Exactly, just like that, or even in Dobbs in abortion, very similar, which is that it's a condition that is only attached to one group of people, and doesn't that just necessarily mean that you're discriminating on that basis? And the Supreme Court was clear, no, that sort of treatment receives rational basis scrutiny, and there needs to be some additional showing of invidious discrimination or pretext to be able to. Well, in that case, of course, we're back in time with the Guduldig case. But here, we know it's not a rational basis. We know that it's some kind of heightened scrutiny. So that alone kind of puts us in a non-Guduldig situation. What's your position on what the State needs to show in that regard? Well, Your Honor, respectfully backing up to the presumption that you just presumed, I think that presumes the conclusion, right? So before reaching whether this receives heightened scrutiny or not, the question has to be, is this discriminating on the basis of transgender status or on the basis of a diagnosis? And so Guduldig already puts us into the rational basis world without ever reaching the heightened scrutiny world. And so the heightened scrutiny does not come into play because the policy only differentiates on the basis of diagnosis. Counsel, I want to talk to you about Guduldig a little more. In that case, I reviewed it, and that was a case where no one gender was comparatively advantaged over another to obtain insurance. Here, can you provide any examples on how the policy burdens cisgender beneficiaries or limits access to them for surgery in any way? Because it appears that only transgender individuals are being limited to access to these surgeries when it's for gender dysphoria. I think that's the exact same thing as Guduldig, though, Your Honor. So in Guduldig, you would have said, well, men can have any sort of things can qualify as disabilities, but for women, there's a whole category of things that don't qualify as disabilities. Or in Dobbs, all treatments are available to men, but for women, abortions are not available, right? And so it's the exact same reasoning. But here, and so here, it's the exact same thing, where you have on both sides of the line, you have people who can receive these same surgeries for other conditions. That includes cisgender and transgender people. Would you agree with me that a cisgender individual is never going to seek a surgery like this for gender dysphoria? That seems likely, Your Honor, yes. Okay. That kind of goes back to what I was saying, is that the only individuals at issue are transgender, correct? The only, very likely, the only ones who are ever going to be affected by this, but that's a disparate impact claim, and the key teaching of both Guduldig and Dobbs is that there needs to be some showing of intent if all you have is disparate impact of a claim. Is it your position that gender dysphoria is not a legitimate medical diagnosis? No, Your Honor. Okay. Should we wait for the Supreme Court, and I hope I pronounce it right, Skirmeti? We think the Skirmeti deals with the same issues here, but here these are mostly backwards-looking claims as far as qualified immunity, and so the question is, what was the law as of May 2022? And so some of these more creative theories about something referencing sex or how would this apply in the diagnosis context as opposed to Karnofsky where it says transgender individuals, yes or no, right? Some of these harder questions makes it clear that this was not clearly established as of May 2022. So at least as far as the qualified immunity portion, that can be resolved now and should be, qualified immunity should be granted. And so I'll reserve the rest of my time for rebuttal. All right. Mr. Beledoff, did I pronounce that correctly? Yes, you did, Your Honor. I'm on a roll today. Good job. All right, counsel, whenever you're ready. Thank you. May it please the court. I'm Howard Beledoff here with my co-counsel, Jane. Can we ask you to either get closer to the mic or speak up, please? Thank you. Okay. Is that better? Yes. All right. Thank you. I represent the plaintiffs, MH and TB, on this appeal. The issue before the court today concerns, number one, the appellate jurisdiction with regard to denial of qualified immunity in a motion to dismiss in a 1983 action. The court reviews the narrow and purely legal question of whether the factual allegations in the complaint, because much of what counsel addressed is not in the complaint and not in the record, taken as true, plausibly alleges a denial of life-saving, medically necessary treatment of gender dysphoria based upon gender identity, and we believe is a violation of the constitutional rights to equal protection and due process. In other words. The district court has said this states a claim, right? It said, yes, plausibly states a claim. Correct, Your Honor. Plausibly states a claim. Yes. That's perfectly correct. And it cited, if you review the order, many allegations in the complaint that stated a claim. Do you concede that further discovery could establish a basis for qualified immunity for Dr. Hamsel? Well, I think the law is clearly established, which is the narrow issue on qualified immunity, as I see it. But discovery is an issue here because they have alleged a policy. Well, there was no policy when this complaint was filed. The closest thing we have to a policy is the governor's letter that came in seven months after the complaint. And the policy apparently is, according to the governor, which I might say specifically referred to the plaintiffs in this case, said sex reassignment surgery is not available to change the appearance of someone's biological sex, sex at the time of their birth. That clearly is facially and by proxy discrimination. Sex reassignment surgery, who does that apply to? Changing the appearance of their assigned sex at birth rather than their gender or identity, which means it isn't the assigned sex at birth. So that was pled. That's what the Court found was the issue in this case, that was Idaho's, I'll say, policy, but we don't know, as was raised. At MH's fair hearing, she proved the reason that Dr. Hamso denied authorization for the surgery was she believed she didn't have 12 months of hormone therapy. And that got passed over and said, okay, you're incorrect about that, but now we're into what I think is the issue here, and that is whether it's medically necessary was the second question. Right. And that's a factual issue. And in our complaint, we plausibly allege it was medically necessary. Every major medical. And let's just credit that statement in your complaint, but then we have to kind of jump over to Dr. Hamso. And the question is what is it in the law that would compel her to know that this was a gender or transgender-based discrimination? So, you know, there's kind of two or three cases going on here, if you will. There's Idaho policy. There's the injunction. But we do have to focus just on Dr. Hamso and her potential qualified immunity. Well, let me get back to his honors question. It's kind of put together here. We're at a motion-to-dismiss phase. We just accept the factual allegations. I haven't had discovery. I don't know anything about what Dr. Hamso was thinking. But what I do know is there are many, many cases. We have Bostic that talks about discrimination against transgender status. We have Karnisky that specifically talks about it. And let me read you, because apparently footnote 18 is not fully understood. It says, quote, because of the 2018 policy discriminates on the basis of transgender status on its face, we need not address whether it constitutes discrimination against transgender persons on the alternative ground that gender dysphoria and transition are closely correlated with being transgender, which is another way of saying proxy. So Karnisky found that the policy discriminates on the basis of transgender status. That is fair warning. That's what we have to show. We don't have to show under U.S. Supreme Court President and Ninth Circuit that there's a case directly on point. Could I just interrupt? There's been some discussion in the briefs about whether proxy discrimination was alleged. I know the district court used those words. Did the plaintiffs here allege proxy discrimination? Well, proxy discrimination as a legal conclusion. That's kind of a yes or no answer, and then you can explain. Yes, we did, Your Honor. Yes, we did. Because we did allege that transgender people couldn't get the surgery based upon gender dysphoria, while cisgender people could get, would be approved for that surgery and were getting that surgery. And let me just say at the beginning of this case, Your Honor, the position of the defendants was that they were only challenging the surgeries. People were getting gender, medically necessary treatment for gender dysphoria. They weren't getting it until recently when Idaho passed a new statute, in effect, January 1st. So there's clear discrimination here. The court picked up on the allegations, and it was one of the things that the court asked me at the hearing on the motion. And I don't know if the word proxy is in the complaint, but under Iqbal, I need to plead facts. I need to plead a plausible claim. And I think there is clearly proxy, you know, where you have a discrete group, and you may have a neutral criteria but only applies to that discrete group. As the cases say, if you have gray hair, if you're going to discriminate on the basis of gray hair, that could be discrimination against people of age, age discrimination. If you tax a yarmulke, you don't say it applies to Jews or non-Jews, but if you tax a yarmulke, that's proxy discrimination because only Jewish people wear yarmulkes as part of their religious faith. Well, I think one response, and I'll let the State make its own response, but one response may well be what you're talking about is really disparate impact. So I would appreciate your comments on their claim that what you're really talking about is disparate impact, which wasn't alleged. Well, Your Honor, I think the Governor's letter came in the day before, seven months after the complaint was filed, and the State submitted it. And that's where you have the proxy discrimination on its face. That's where you have the facial discrimination on its face. Do you have anything other than Governor Little's letter for the proxy discrimination? Well, this is what the issue is with the motion to dismiss. I didn't have discovery. I don't have a burden to present evidence. That's summary judgment. They get a chance to put their side in, and I get a chance to counter it with my declarations. That's why the court held in this case, the court did not deny qualified immunity. It said it was premature and undeveloped. And it specifically says they could come back on summary judgment. And I think that is the court side of the Flores case and a few other Ninth Circuit cases for the proposition. And Peltier actually, with regard to jurisdiction, says, we don't like to see these cases on a motion to dismiss because the purely narrow legal question, you know, cannot necessarily be answered because all it is based upon the facts in the complaint. And that's where I am now. So when you ask me questions on the merits, I just go to the complaint and say, I don't have to prove it. I plausibly allege it. That's Iqbal. And Iqbal was a Bivens case. And Iqbal said, you know, it was Attorney General Ashcroft and the director of the FBI. They pled Bivens. And all the cases that they allege jurisdiction are Bivens cases. Why? Because Bivens is a court-created claim. 1983 is congressionally enacted. Everybody has a right to that. The court has narrowly developed a Bivens claim for constitutional rights against federal officers, but has severely cut that back. And I think it's very clear in the cases that they make an exception of the Mitchell v. standard for Bivens cases because they're so narrow, the Bivens cases, that they're going to look at that. And in each case they have, they never get to the qualified immunity because Bivens is so restricted. In Iqbal, they said, well, we're going to look at what's alleged here for federal officers. And they compared it to 1983, says there's no respondent superior. And so they went there and they said, well, the attorney general and the director of the FBI, they're not involved with any of the alleged constitutional rights, so we're just going to dismiss it. But on a sufficiency of pleadings, you know, they had to figure out, okay, what's the claim? Is there a claim? They looked to an analogous 1983, and they just said, no, we're not going to reach that. But Bivens is really a pleading sufficiency case. That's all it is. It doesn't jerry-rig or bootstrap jurisdiction for an interlocutory appeal. That's what we have here, interlocutory appeal. The Supreme Court carved that out under the collateral order doctrine in those clear cases where there was sufficient evidence. There was one case, I'm not sure what it was, where the officer said they weren't there, you know. But it's very clear. I have a couple cases I would like to ask you about. Let's go back to your comment about Konarski, and it triggers heightened scrutiny. Yes. So now let's put Dr. Homsow into the picture. And how does she figure out that she might be violating some constitutional right? Is she supposed to evaluate heightened scrutiny, or what is she supposed to do? Well, as you know, Your Honor, this is a judge-made theory. I understand. Okay. And, you know, you hit upon a problem here. But it's present in every case. So they look to, was the law clearly established, and they look to other cases and other circumstances. And for equal protection, the district court, the magistrate, said, you know, that the Ninth Circuit has said the law, that principles of qualified immunity are clear, you know. And there's a long line of cases. Doe versus Schneider. Okay. Judge Callahan, in review of the denial of the preliminary injunction, said, well, first, Bostock is not limited to Title VII. This is for purposes of remand. And in support of that, in a footnote, she cited four different cases in which transgender, medically necessary treatment for gender dysphoria for adults that create, you know, I believe give notice. Now, when you apply legal concepts that we're here all disagreeing about today to the man on the street, be it a Dr. Hamsel, be it a police officer, be it a, you know, a municipal person, they don't really know. You know, they're not lawyers. They don't read the books like we do. They don't read the cases. They don't keep up with that. But that's why they have qualified immunity, as I understand it. They're going to give it to them. But the one thing they can't do, they just can't go out and violate people's rights. And if they think that they should be on notice, that they need to look. As a matter of fact, in the record, in the complaint, TB's mother sent e-mails trying to get a decision. And we don't have a decision today. How many years later, we have no decision of the actual reason why Dr. Hamsel or anybody else denied it. They haven't given it to us. So let me have a couple more questions related to that. So you're saying that the state has indicated it's because it's not medically necessary. That was kind of part two of the decision, or not medically indicated. And you're saying that we don't have that decision somewhere? We don't have that decision somewhere in this case you're talking about? Well, it's the only case that's here. I thought you were referring to a case precedent, Your Honor. Well, I do allege it's medically necessary. I do allege that. No, no, no. I guess my question is the flip of that. You're saying we don't have a decision from the state. So are you saying that the state, we have no decision in writing or otherwise, at the time this occurred, that the basis for rejection was medical necessity? I don't have a decision with that, Your Honor. What I have is Dr. Hamsel denying MH in the initial application for authorization. She said under the WAPATH standards, you haven't complied with the 12-month therapy, right? So she's recognizing the standard of care that's internationally recognized. But then that got responded to. Only at the hearing, it was a nurse, when the hearing officer said, well, is there any other reason? Which is kind of interesting because that was no notice of that. That came up. And so he re-mandated it back, the hearing officer re-mandated it back, and here we are today, and I don't have a decision. Let me also ask you to respond to Idaho's comments on Gudulik, the pregnancy case, saying, well, that was a case where the only people, individuals who can get pregnant, of course, are women, and it's a rational basis, so that case is out there as controlling law. Why can't that be applied here to invoke qualifying immunity? Let's be clear here. In the case of Gudulik, the court said there are pregnant women in one subgroup and men and women non-pregnant in the other group, and they said there was no discrimination. Here we have transgender men, transgender women who need medically necessary gender-affirming care, according to their doctors, and there's no dispute about that in the record, and you have cisgender male and female Medicaid participants who can receive the same treatments, but they can't receive it because of the diagnosis of gender dysphoria, which is clearly inherent in the status of being transgender. It's inherent in sex. You can't make that decision without looking at the sex. You know, as the Supreme Court said, it said, well, as the court said, thus defendant's seemingly neutral exclusion is not so. The exclusion of gender-affirming care precludes a specific treatment that is connected to a person's sex and gender identity. Gender dysphoria is inherent in being transgender. Non-transgender people don't get gender dysphoria. So you are talking about that. And it wasn't based upon the sex assigned at birth versus the sex that somebody, the gender identity based on the sex that isn't assigned at birth. So it's not only facial and proxy, but it's sexually stereotyping. That's also discrimination in this case because they're not living up to or they're not living with what somebody thinks a masculine person should do and somebody thinks a female person should do. Counsel, I would like some clarification on your due process claims here. So this is a two-part question. My first question is, are you alleging that there was not adequate hearing and notice to the plaintiffs to address the denials or their infinite non-decision? So it's your due process claim based on that. Or are you saying that your clients have a due process right to the treatments themselves? Well, procedural due process is just that, notice and an opportunity to be heard. Goldberg v. Kelly gives them that. What is that, a 1974 decision? The Medicaid regulations say, specifically addressing due process, that Congress said you've got to provide due process in this. This is a government entitlement. This court in KW v. Armstrong, Mr. Armstrong was the director of Idaho Department of Health and Welfare, said they have a due process right. They have an entitlement. They have an entitlement to these benefits. So the determination of whether they should receive it or not, you've got to provide notice. Okay. We didn't have notice of the cosmetic. We didn't have notice of what they allege the right is. Okay. So it's yes to my first question. My second question then, are you also saying that your clients have a due process right to the treatments themselves? That would be a more substantive due process, Your Honor, you know, versus a procedural one. We do not have a substantive due process claim. That's the LW Schmerti involving minors. Okay. I agree that I don't believe that case. So, Counsel, you're running out of time, so let me get my other questions in. Is it your position that Dr. Hamso cannot legitimately regulate what diagnosis Idaho Medicaid treats? So does she not have the right to make that decision? Your Honor, the way I look at it is you can regulate, but you can't discriminate. That's the distinction here. They're discriminating in the way they're approving or not approving surgeries among people. It's as simple as that. You can't say it. Congress didn't give Dr. Hamso the right to discriminate in Medicaid. I can assure you of that. Dr. Hamso in Medicaid, when she's the medical director, cannot discriminate on the basis of sex or transgender status. Okay. One last question on the due process. What specific statute or case law would make it clear that Dr. Hamso, that a delay attributed to Dr. Hamso would be unlawful? Well, let me preface it by saying in the complaint there's allegations of the clients were repeatedly contacting her. As a matter of fact, wouldn't talk to her. We're taking all the allegations in your favor, but we're benchmarking it under qualified immunity under some law or regulation that would say, Dr. Hamso, you knew you violated their rights. What do I look to? Well, there's actually an Idaho statute that says they have a right to notice and fair hearing. That's the first thing. There's the Medicaid regulations that say you have to abide by Goldberg v. Kelly and all the things and all requirements. But the allegation that there's this delay, how is she, how is it attributed to her? Well, the regulations say you have to make a decision within 90 days. So I don't know how you get more clear notice when Congress passes a statute and HHS, who monitors or administers the Medicaid program, which Spiker says they must comply with, you know. I don't know how you can get more notice of that. And I believe she actually knew that when she applied the WOMPATH standard. She actually knew that the standard of care for, and she's a doctor, so she knew gender dysphoria is a diagnosis, and she knew that she had to go to WOMPATH and she knew that it was a treatable disease and the harmful effects that the clients would suffer if it went untreated, which they suffered. Counsel, you are out of time. Thank you, Your Honor. Thank you. All right. Mr. Beledoff. Mr. Zarian. Oh, sorry. Sorry, Mr. Zarian. Yeah, no, I apologize. You've had your chance. No second chances. I apologize. Thank you. No worries. Three quick points on rebuttal, Your Honors. First, just to due process. The question for due process is whether property was deprived without due process of law. That's the Constitution. So the question isn't was a procedural step denied. This isn't just a general claim for bad procedural things. The first step, the antecedent question is what is the property interest? And the thing that was denied was coverage for one treatment. And I think I just heard them disclaim that they thought they had a property right in any treatment. No case has ever held as much. And so that is enough to dispose of the due process claim. As far as Karnosky, Karnosky did discriminate on the basis of its face. It said transgender persons may not serve in the military. And here, the alleged policy does not use those words, in on the face, the theory needs to be proxy discrimination. And that makes it much more complicated. And it brings in these dobs and gaduldig and some of these complicated factors. The district court called this all the nuance to the claim. And that nuance is precisely why this is not clearly established. And that's why the Supreme Court has granted cert on essentially the same question. It's because it's not clearly established yet. And the last point I wanted to raise was that they have not pleaded proxy discrimination. And that makes all the difference. And it wouldn't have been proxy discrimination anyways. They raised the example of attacks on yarmulkes, for example. And when Bray talks about the talks, Bray is the case that gives that example. When it talks about attacks on yarmulkes, what it says is that such an irrational object of disfavor, that we can presume animus against that group. And here, there is an ongoing medical debate as to the efficacy of these treatments. And the Obama administration in 2016 declined to issue a nationwide Medicare mandate to cover these treatments. And I would be surprised to hear my friend on the other side say that that must have been, it was so irrational that it must have been motivated by animus. And in those circumstances, when it's not clear how these treatments should be handled, that gets left to the state to decide. And that's what rational basis review is, and particularly with a qualified immunity overlay that disposes of the case. What's your response to the argument, I think I heard from counsel for appellants, that they still don't have an administrative decision on the availability of this care? Well, Your Honor, they did not receive a decision throughout the process. And what they've alleged in their complaint is that they haven't received a decision. But the allegation here is that there is a policy, and that that policy has adversely affected them, and that it's unconstitutional. And we've come in now and defended ourselves against this allegation of an alleged policy. So it's not a question of finality or appeal from an administrative decision. The state has been accused of implementing an unlawful policy, and here we are defending ourselves against that charge. I had a follow-up on that due process question still. What's the extent of Dr. Hamso's and Idaho's discretion to regulate the Medicaid program? Are there any limits? There are some limits. The Supreme Court talked about in Beale broad discretion requiring only that standards for determining the extent of medical assistance be reasonable and consistent with the objectives of the Act. I think 42 CFR 440.230, the dot 230, also talks about the agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures. So that is one of the things the state can do in limiting what's covered, is rely on medical necessity. So if the diagnosis here was cancer instead of gender dysphoria, would you still find that Dr. Hamso's delay here is reasonable? I don't think we've argued about whether the delay is reasonable or not. The question, would we still argue that there's no constitutionally protective property interest in a cancer treatment? Yes, we'd raise that same argument, and that they can argue that that's not rational or that the denial is arbitrary and capricious or something along those lines is an appeal from an administrative decision. But as far as due process clause, that wouldn't have anything to say on this subject. Any questions? And with that, we would ask the Court to reverse. Thank you. All right. Thank you, counsel. The matter is now submitted. Have a wonderful day.
judges: HAWKINS, McKEOWN, ALBA